641 So.2d 146 (1994)
Kris HELTON, Appellant,
v.
The STATE of Florida, Appellee.
No. 92-725.
District Court of Appeal of Florida, Third District.
July 26, 1994.
Rehearing Denied August 31, 1994.
Bennett H. Brummer, Public Defender, and Louis Campbell, Asst. Public Defender, for appellant.
Robert A. Butterworth, Atty. Gen., and Michael J. Neimand, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and NESBITT and COPE, JJ.

On Rehearing Granted
COPE, Judge.
We grant the State's motion for rehearing, withdraw the opinion dated May 11, 1993, and substitute the following opinion:
Kris Helton appeals his conviction for first degree murder. We affirm.

I
Defendant was convicted of murdering his fiance's 22-month old son. The evidence against him was circumstantial. He contends that the evidence does not exclude every reasonable hypothesis of innocence, and accordingly that his motion for judgment of acquittal should have been granted.
The principles applicable in circumstantial evidence cases are outlined in State v. Law, 559 So.2d 187 (Fla. 1989). There, the court said:
The law as it has been applied by this Court in reviewing circumstantial evidence cases is clear. A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and *147 where there is substantial, competent evidence to support the jury verdict, we will not reverse.
... .
... A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Consistent with the standard set forth in Lynch [v. State], [293 So.2d 44 (Fla. 1974)], if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law." 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla.R.Crim.P. 3.380.
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.

559 So.2d at 188-89 (some emphasis added; some emphasis in original; footnotes and citations omitted).
"The total convincing force and effect of the evidence, as well as the reasonableness of the suggested hypotheses of innocence, is for the jury to weigh under proper instructions." Bouler v. State, 389 So.2d 1197, 1199 (Fla. 5th DCA 1980).
Moreover, "the circumstantial evidence standard does not require the jury to believe the defense version of the facts on which the State has produced conflicting evidence, and the State, as appellee, is entitled to a view of any conflicting evidence in the light most favorable to the jury's verdict." Peterka v. State, 640 So.2d 59, 68 (Fla. 1994) (citations omitted); accord Cochran v. State, 547 So.2d 928, 930 (Fla. 1989); Fowler v. State, 492 So.2d 1344, 1346 (Fla. 1st DCA 1986), review denied, 503 So.2d 328 (Fla. 1987).
Finally, as a general evidentiary principle:
Where the evidence is in conflict, it is within the province of the trier of fact to assess the credibility of witnesses, and upon evaluating the testimony, rely upon the testimony found by it to be worthy of belief and reject such testimony found by it to be untrue... . The testimony of a single witness, even if uncorroborated and contradicted by other State witnesses, is sufficient to sustain a conviction.
I.R. v. State, 385 So.2d 686, 687-88 (Fla. 3d DCA 1980) (noncircumstantial evidence case); see also Freeze v. State, 553 So.2d 750, 753 (Fla. 2d DCA 1989). With these principles in mind, we review the evidence.

II
Defendant was engaged to Marcella Gunderson. They resided together in Ms. Gunderson's rental home on Little Torch Key. Defendant sold computers. Ms. Gunderson was director of a kindergarten and also babysat children in her home.
Ms. Gunderson had three children from a prior marriage: Matthew, age six, Michael, age four, and the victim, Marshall, age 22 months. Defendant had a good relationship with the older boys. The victim, however, did not like the defendant and would squirm and try to get away if defendant held him.
On July 31, 1991 Ms. Gunderson was at home with the children. The victim had an ear infection but was otherwise in good health. She put the victim to bed at 8:30 p.m. He was uninjured at that time. The four year old was also put to bed. Each child had a separate bedroom.
At 9:30 the defendant arrived home. By his account he had had two beers before coming home. The six year old was then put to bed and defendant had dinner. By defendant's account he consumed two or three *148 more beers at that time. However, there is evidence which would support the conclusion that defendant had five beers after arriving home that evening.[1]
Before going to bed, Ms. Gunderson checked on the children and they were all fine. The couple retired to watch TV at 11:00 p.m. Ms. Gunderson testified that she dozed off around 11:15. At 1:30 a.m. Ms. Gunderson awakened. She observed that the defendant was sitting up in bed, smoking. He had a worried look on his face. She thought the defendant was worried about his business. When she asked him what was wrong, the defendant told her that she had bumped him while sleeping, which had awakened him.
Ms. Gunderson got up to check on the children. The victim was not in his crib. Ms. Gunderson asked the defendant to help her look and went throughout the house turning on the lights. She then found that the front door to the house was standing open. In the front yard, at the bottom of the front steps, was the victim, lying face down. He was not breathing and the back of his head was soft to the touch. Defendant took the child and shook him. Ms. Gunderson took the child back. The couple attempted cardiopulmonary resuscitation while the rescue squad was on the way. The child was pronounced dead on arrival at the hospital.
After investigation, the state charged defendant with first degree murder. At trial the defendant argued that there were at least four hypotheses of innocence: that there had been an accident; that an outside intruder had committed the crime; that Ms. Gunderson's ex-husband had committed the crime; and that Ms. Gunderson herself had committed the crime. Although not argued by the defense, the state also addressed the hypothesis that the other children had committed the crime. We next consider those hypotheses.

III

1. An accident
Defendant suggested that the victim had climbed out of his crib, opened the front door, and fell off the porch, fatally injuring himself.
Assuming the child had climbed out of the crib,[2] the state adduced evidence showing that the front door was secured by two locks and a latch, and that the child could not have opened it. The front door had a conventional doorknob with a lock in it. The front door also had a deadbolt lock keyed from the outside, with a handle on the inside. Finally, the front door had a child-proof latch six feet above floor level.
The evidence showed that the victim could barely touch the inside handle of the deadbolt lock with his fingers, but could not grip or turn it. There was no way that the victim could reach the child latch six feet above floor level. Ms. Gunderson testified that all of the locks were locked from the inside on the evening in question. Further, there was other testimony that Ms. Gunderson was scrupulous about keeping the front door locked at all times.
Assuming (contrary to the evidence) that the child had somehow opened the door and reached the front porch, the medical evidence categorically refutes any theory that there was an accident. The height from the front porch to the ground was 28 inches. The medical examiner testified that the child had two extremely severe skull fractures. This would have required at least two strong blows with a blunt object and would have had *149 to be inflicted by an adult. Given the force of the blow, the child would not be able to cry out and death would follow within a few minutes. A portion of the child's brain had been pressed through one of the skull fractures, and the child had bled extensively between the skull and scalp, resulting in the perception that the back of the child's head was soft. However, there was no external bleeding.
The medical examiner unequivocally rejected the possibility that this was an accident. According to the medical examiner, the degree of force involved would have been equivalent to a fall from a three story building, or being struck by a car going 30 miles per hour.
Plainly the jury was entitled to reject this hypothesis of innocence.

2. The brothers.
The defendant never suggested below that the four year old and six year old brothers inflicted this injury. However, the state in an abundance of caution adduced evidence that no child could have inflicted these injuries.

3. An outside intruder.
Defendant argued that an outside intruder could have entered the house, taken the child from his crib, murdered him, and left the premises.
The state adduced evidence to the contrary. Ms. Gunderson's yard was surrounded by a high cyclone fence. It had a wooden gate with a deadbolt lock. Ms. Gunderson testified that the front gate was locked after defendant came in. Furthermore, the gate was closed at the time that the victim was found at 1:30 a.m.
Once inside the fence, the front yard and back yard were divided by a wire fence. This kept Ms. Gunderson's two dogs in the back yard. The dogs could, however, come up to the fence and could also go underneath the house, which was about two feet above the concrete slab. The dogs would ordinarily bark when any stranger came into the front yard.
As already mentioned, the front door had two locks and a latch on it. The doorknob lock and the deadbolt lock were keyed to the outside. The child-proof latch was on the inside.
Defendant testified that Ms. Gunderson had had her purse stolen out of her car along with her identification. He theorized that a thief could have taken the keys, found the address, and entered the house. Ms. Gunderson testified, however, that after the theft took place she had the locks on the house changed. She testified that no one else had keys to the house other than herself.
Even if it were hypothesized (contrary to the evidence) that some intruder had a key which would have opened the front gate and the locks on the front door, the child-proof latch was latched from the inside. The intruder would have had to force the front door open, breaking the child-proof latch. The police officers' investigation showed no signs of forced entry into the house at the front door, or anywhere else. Furthermore, the intruder would have had to cross the front yard without the dogs barking.
The house also had a sliding glass door that entered the back yard. One portion of the sliding glass door was fixed, while the other was movable. Ms. Gunderson testified that the movable portion of the sliding glass door had been latched that night and was secured by another device as well. It was, however, possible to move the fixed panel and obtain entry. To do this required a great deal of force and would create an extremely loud noise which could be heard throughout the house. Moreover, to reach the back door, an intruder would have to pass through the back yard where the dogs were kept. There were no signs of forced entry at the sliding glass door, and the dogs were silent all evening.
Assuming these obstacles could have been overcome, the intruder would have had to find his way without being seen or heard. The infant's crib was only 13 feet away from the master bedroom. All of the interior doors were open. The house had an open ceiling arrangement which allowed noise to *150 carry well throughout the house.[3] The intruder would have had to enter and exit during the time interval when Ms. Gunderson and defendant were both asleep. The intruder would have had to find a way without bumping into things, remove the child, and exit without causing a disturbance.
Before the hypothetical outside intruder left the house, the intruder would have had to do two other things. When the house was inspected after the child's death, two items were observed which suggested that the real wrongdoer had tried to create an appearance that the incident was an accident. At the time the couple went to bed, there was a full pitcher of Kool-Aid on the bottom shelf of the refrigerator. After the child's body was discovered, the pitcher was found in front of the refrigerator, lying on its side. Kool-Aid had been spilled all over that area of the kitchen floor.
Upon examining the child's room, it was found that the side of the crib was in the "down" position. This created an appearance that the side of the child's crib had come down, that the child had left the bed and gone to the kitchen, that the child had attempted to get a drink of Kool-Aid and dropped the pitcher, and that the child then somehow had opened the front door and gone outside.
Upon study of the kitchen area, however, the police officers found that there were no splashes of Kool-Aid on any vertical surface, even though splash marks would have been expected had a full pitcher been dropped. The child was wearing pajamas with long pantlegs. There was no Kool-Aid anywhere on the child's pajamas, or on the child's hands or feet.[4] The state argued that the Kool-Aid was poured out on the floor after the child was killed, in order to create a scenario that would suggest the child went from crib, to kitchen, to front porch, to a fatal accident.
About two weeks before the death, a part of the child's crib broke which helped hold the side of the crib in place. Ms. Gunderson had reattached that portion of the crib using a plastic-coated wire. The side of the crib had held securely for the two week period, and Ms. Gunderson testified that the wire was in place and securely fastened when she went to bed. Upon examination after the child was found, the wire had been dislodged, which would allow the side of the crib to come down. One possible explanation would have been that the child dislodged the wire, but an adult who knew how the crib side was fastened could have done the same thing.
In order to support an outside intruder theory, the outside intruder would have had to figure out how to lower the side of the crib by dislodging the wire, so as to create an "accident" scenario. Further, the outside intruder would have had to go to the kitchen, find the Kool-Aid, and create the Kool-Aid spill. All of these matters would have had to occur in the relatively short interval that the defendant testified that he was asleep, and all of these steps would have to have taken place without awakening anyone, in a house where sound carried rather easily.
The state's evidence contradicted this hypothesis and the jury was entitled to reject it.

4. The ex-husband
Ms. Gunderson's ex-husband lived about 25 minutes away from Ms. Gunderson's home. The dogs knew him and would not bark when he approached. He had visitation rights for the children. The defendant suggested that the ex-husband could have successfully made his way into the home, taken the victim from his crib, killed him, and then returned to his own home, 25 minutes away.
The state adduced evidence to the contrary. Ms. Gunderson testified that her ex-husband did not have a key to her house. Defendant suggested that possibly the ex-husband *151 had been the one who had stolen Ms. Gunderson's purse and thereby had obtained the keys. However, as already stated, Ms. Gunderson testified that the locks on the house were changed after the theft of her purse.
While the ex-husband may have been able to enter the front yard without arousing the dogs, he would have had to force the front door. Even if he had had a set of keys, the child-proof latch was latched on the inside. As already stated, there were no signs of forced entry.
Furthermore, after the victim's body was discovered Ms. Gunderson called the next-door neighbor for assistance. At 2:30 a.m. the next-door neighbor called the ex-husband to tell him what had happened. The neighbor testified that she could tell from the ex-husband's voice that the telephone call had awakened him from sleep. The ex-husband then went to the hospital where he became very upset upon learning that the child had died.
The jury was entitled to reject this hypothesis of innocence.

5. Ms. Gunderson
Defendant's final trial hypothesis was that Ms. Gunderson committed the murder. Defendant testified that he dozed off for a portion of the time after he and Ms. Gunderson began watching television. He theorized that Ms. Gunderson could have crept out of bed, taken the child from the crib, killed the child, and returned to bed.
Here, too, the state introduced testimony directly contradicting this hypothesis. Ms. Gunderson testified at length during the state's case-in-chief. She recounted all of her activities on the night in question. She was specific that the child was unharmed and in good health when she put the child to bed. She testified that the child was still unharmed and in good health when she checked on the child before she went to bed. She testified that she did not leave her bed from the time she retired until she awakened at 1:30 a.m. She explicitly denied harming the child in any way. She was subject to cross-examination on all of these points. All of this testimony is squarely contrary to defendant's hypothesis that Ms. Gunderson killed her own child.
Ms. Gunderson's testimony, without more, created a factual issue for the jury. Her testimony, if believed, is squarely inconsistent with the defendant's theory of events. State v. Law, 559 So.2d at 189. "Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." Id.
Defendant argues that Ms. Gunderson's testimony had to be disregarded because defendant suggested that she might have been the perpetrator. That is not so. As stated in Peterka v. State, "The circumstantial evidence standard does not require the jury to believe the defense version of the facts on which the State has produced conflicting evidence, and the State, as appellee, is entitled to a view of any conflicting evidence in the light most favorable to the jury's verdict." 640 So.2d at 68 (citations omitted); accord Cochran v. State, 547 So.2d 928, 930 (Fla. 1989).
Defendant suggests that his hypothesis of innocence renders Ms. Gunderson somehow an "interested" witness and that therefore her testimony must be discounted as self-serving. That is not the law. Under the Evidence Code, "Every person is competent to be a witness, except as otherwise provided by statute." § 90.601, Fla. Stat. (1991). As stated in I.R. v. State, "[t]he testimony of a single witness, even if uncorroborated and contradicted by other State witnesses, is sufficient to sustain a conviction." 385 So.2d at 688 (citations omitted).
Boiled down, defendant's position is that Ms. Gunderson should not be believed. That argument goes to the weight of Ms. Gunderson's testimony, not its admissibility. Defendant cannot make Ms. Gunderson's testimony disappear by sleight-of-hand. Instead, defendant may use the conventional techniques of cross-examination (which he did, extensively) and may argue the credibility issue to the jury. The decision on credibility is for the jury to make. The trial court properly submitted the case to the jury as trier of fact, and the evidence is sufficient to convict.
*152 The State adduced other evidence which could be viewed as pointing toward defendant. Since Ms. Gunderson's testimony created a jury issue in and of itself, the other evidence need be mentioned only in passing.
There was evidence that the defendant attempted to conceal the amount of alcohol he had consumed on the evening of July 31st, by attempting to hide the empty beer cans in the bedroom and by denying to an investigator that he had brought any beer home with him that evening.[5] At the hospital the defendant made a statement to a police officer showing fear that he might be blamed by the ex-husband for the child's death, even though the ex-husband had made no such accusation and at the time, the child's death was thought to be an accident.[6] When the child's body was found in the front yard, the defendant handled the child roughly, shaking him in an effort to revive him.[7] One week prior to the child's death, the defendant had become angry at the child when the child squirmed and tried to get away while the defendant was holding him.[8] After the child's death but before the autopsy results were in, defendant had conversations with Ms. Gunderson's father and with a friend in which he advanced hypotheses of accidental injury of the child.[9]
*153 In sum, Ms. Gunderson's testimony squarely contradicted the defendant's hypothesis that she committed the murder. Whether Ms. Gunderson's testimony is considered by itself, or in conjunction with the other evidence adduced by the State, the motion for judgment of acquittal was correctly denied and the case was properly submitted to the jury. The jury was entitled to make a credibility determination and to reject the defendant's hypothesis of innocence.

6. The new appellate hypotheses
For the first time on appeal, defendant has offered two variations on the evidence adduced at trial. Although never argued below, defendant now asks this court to make the factual determination that these hypotheses are reasonable ones requiring his acquittal.
Under State v. Law:
The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
559 So.2d at 189 (citation omitted). The time to have offered such theories was at trial, not for the first time on appeal.
That said, we will nonetheless briefly address the new arguments offered here. First, defendant suggests that although the victim could not have opened the front door himself, the four year old and six year old brothers were big enough to operate the deadbolt lock. The evidence also showed that the four year old and six year old were big enough to take the victim out of his crib. Accordingly, the defendant suggests the hypothesis that after 11:15 p.m., defendant and Ms. Gunderson were both dozing; the four year old and six year old got out of bed, took the victim out of his crib, opened the front door, and went into the front yard to play. At that point, presumably there was an accident, or an intruder came through the front gate.
There is, however, no evidence that the four year old and six year old could reach the child-proof latch that was six feet off the floor. There is no testimony by anyone that the four year old or six year old child went into the front yard after 11:00 p.m. on the night in question. There is no evidence that the four year old or six year old had Kool-Aid on them. Furthermore, assuming the children had reached the front yard, the medical examiner ruled out death by accident or murder by the four year old and six year old children. An outside intruder would have had to enter through a gate which was closed with a deadbolt lock. The dogs barked when strangers came into the yard. And under the defendant's hypothesis, either the four year old and six year old went back into the house leaving the victim outside, or the four year old and six year old witnessed their brother's murder and then quietly went back to sleep. Merely to outline these facts is to demonstrate why defense counsel would not have made such an unreasonable argument to the jury.
Defendant's next argument advanced for the first time on appeal is that Ms. Gunderson killed the child, but did it prior to the defendant's arrival home at 9:30 p.m. Defendant argues that Ms. Gunderson had the opportunity because she was at home alone with the children. Under this hypothesis, Ms. Gunderson killed the child, put the child in the crib or concealed his body, and after defendant dozed off, moved the body to the front yard.
This hypothesis is contradicted by the medical evidence in the case. Under defendant's new scenario, the child had been killed well over four hours before the discovery of the body at 1:30 a.m. According to the medical examiner, the child's body would have begun to show stiffening at two hours after death, and rigormortis would have been set at about four hours. Since there were no signs of stiffening at all, the medical examiner put the time of death at two hours or less. *154 Furthermore, Ms. Gunderson would have had to successfully carry out this homicide and concealment with an active six year old child awake in the household.[10] Finally, this entire theory is directly contradicted by Ms. Gunderson's own testimony, which testimony the jury obviously believed. The Law decision is quite clear that the state does not have to anticipate every possible variation on events which the defendant might suggest. Plainly, the state had discharged its burden under Law.
In sum, the trial court's denial of the motion for judgment of acquittal was completely correct. The state adduced evidence which directly contradicted every reasonable hypothesis of innocence, and several unreasonable hypotheses as well. It was for the jury to assess credibility. The evidence was legally sufficient to support the conviction.

IV
No reversible error is shown by any of the other points on appeal.
The conviction and sentence are affirmed.[11]
SCHWARTZ, C.J., concurs.
NESBITT, Judge (dissenting):
I respectfully dissent. I would reverse the defendant's conviction and award him a new trial for ineffective assistance of his trial counsel as a matter of law.
In this case, the state called the Monroe County Medical Examiner who testified among other things, that the absence of rigor mortis in the victim's body when it was discovered at 1:30 a.m. indicated that death probably had occurred within two hours. However, the medical examiner also stated that death might have occurred as long as four hours before the body's discovery. Here, the jury could have easily inferred that the time of death occurred some time after 11:15 p.m., after the child's mother had fallen asleep. There can be little doubt but that this testimony aided the state in the successful prosecution of the defendant.
At trial, the child's mother testified that on the day in question the child was suffering from a recurring earache and that she had fed him a supper consisting of chicken and rice at 6:30 p.m. The child would not eat very much, and for that reason, the mother had fed him a small amount of strawberry yogurt. The child was put to bed at 8:30 p.m.
The medical examiner testified that during his autopsy of the victim, he examined the abdominal cavity of the child and discovered "what appeared to be rice and also a pink substance." He stated that the stomach contents observed were consistent with the child's last meal. The medical examiner did not perform tests to determine the exact identity of the substances observed. Defense counsel did not cross-examine this pathologist about his observations or the possible use of the gastric contents as a basis for determining the time of death, nor did counsel call any pathologists to discuss and render any opinion about the matter.
The use of gastric analysis of stomach contents as an aid in determining time of death has been in a state of evolution within the medical community. It is generally accepted *155 that when the food eaten, together with the time it is eaten, are known and there are few or no other variables, the test can be an aid in determining time of death although there remains a wide divergence of opinion regarding time frames. Estimations for the digestion of stomach contents vary with the lowest range being approximately two hours and the upper end reaching as long as six hours.[1]
In People v. Hendricks, 145 Ill. App.3d 71, 99 Ill.Dec. 20, 34, 495 N.E.2d 85, 99 (4th Dist. 1986), reversed, 137 Ill.2d 31, 148 Ill.Dec. 213, 560 N.E.2d 611 (1990), a district court approved the use of such gastric analysis information and cited cases from that jurisdiction which had previously determined that such evidence was admissible. In that case, two forensic pathologists testified on behalf of the state and two testified on behalf of the defendant. There the court summarized the scientific view and explained the divergence of opinion stating:
All of the experts here agree that gastric analysis may not be used to state a precise time of death or to state a narrow range of time during which death occurred. The experts agreed that there was dispute in the scientific community as to how useful gastric analysis is in determining a time of death. However, the state's experts, Davis and Baden, did not state a precise time of death, but they posited a range of time during which death occurred. The defendant's experts stated the range was too narrow and variables precluded correlating digestion and gastric emptying with a specific time frame. Baden and Davis stated that, in the instant case, the average range applied because variables, which ordinarily might retard digestion, could be eliminated.
Hendricks had been tried and convicted for the murder of his wife and three children. The testimony developed showed that on the day in question Hendricks had taken his three children to a pizza restaurant at approximately 6:30 p.m. and ordered vegetarian pizza and root beer. The children ate the pizza between 7 p.m. and 7:15 p.m. There, Dr. Joseph Davis, board certified forensic pathologist and chief medical examiner for Dade County, Florida, was called as a witness for the prosecution. Summarizing Dr. Davis' testimony, the court observed:
Davis also explained the basic process of digestion. He pointed out that many factors can affect digestion: severe emotional trauma, strenuous exercise, and some physical diseases may delay digestion. Davis testified that digestion stops at death. He stated that the pizza eaten by the children would have been completely digested within 3 to 4 hours of consumption. It was Davis' opinion that the children died after 8:30 p.m. but before 11:30 p.m.
495 N.E.2d at 99.
The district court affirmed Hendricks' conviction. Thereafter, the Supreme Court of Illinois reversed that decision based upon the erroneous admission of evidence demonstrating defendant's motive; nonetheless, in considering this forensic evidence with the other circumstantial evidence, the court concluded such evidence would be admissible and sufficient to support a conviction in a properly conducted retrial.
In the instant case, defense counsel should have discerned and employed this forensic tool to properly defend his client. If, for example, the forensic pathologist had given testimony that gastric contents showed that death had occurred in a short time frame, then the defendant might have easily demonstrated he not only did not kill the child, he could not have had an opportunity to kill the child since he had not arrived home until 9:30 p.m. On the other hand, if the expert testimony developed showed that the death occurred in the mid-range, or even the upper mid-range, after the defendant had arrived at *156 home but before 11:15 p.m., the defendant could have easily argued that the victim's mother must have been involved in the child's death; otherwise, she would have seen or heard the defendant kill the child, as sound would have travelled easily through this house with no ceilings but rather, exposed rafters. Such evidence would have clearly discredited the mother's testimony that all of the children were well when she checked upon each of them just before she retired at 11:00 p.m.
The circumstantial evidence upon which this defendant was convicted was meager. In this case, defense counsel had to be totally ignorant of the potential for the use of gastric analysis evidence, which simple legal research would have disclosed. In this case, the victim was a normal, healthy, 22-month-old baby boy, whose last meal and the time eaten were known. Counsel's deficiency was specific and substantial. There can be no doubt but that this evidence might have affected the verdict rendered.
NOTES
[1] Defendant conceded this in his testimony at trial. In addition, in the bedroom where defendant ate dinner and had the beers, five empty beer cans were found in the wastebasket. The wastebaskets had been emptied prior to defendant's arrival home. Ms. Gunderson testified that she had had one-half of a beer and disposed of it in the kitchen wastebasket.
[2] Because other evidence is dispositive on this hypothesis, we do not need to dwell on the intricacies of the evidence regarding whether the child could get out of the crib, and about the condition of the crib after the child was found. The side of the crib was in a "down" position. The defendant suggested that the side of the crib may have fallen down, allowing the child to get out of bed. The State argued that the defendant had placed the side of the crib in that position after killing the child, in order to create a cover story that the child had gotten out of bed on his own.
[3] The house had an open-beam design. The interior walls went up only seven feet and did not go completely to the ceiling. In other words, a person could sit in one room and throw a tennis ball over the wall and have it land in another room. Because of this unusual openness, sounds carried easily within the house, although muffled somewhat by the three window-unit air conditioners which cooled the house.
[4] Defendant had Kool-Aid on the bottom of his feet, but testified that he had walked through the Kool-Aid in the kitchen at 1:30 a.m., looking for the child.
[5] In the master bedroom a police officer found a wastebasket that had been covered with a newspaper, with the edges folded down and tucked in. This caught the officer's eye, because it was unusual. The defendant conceded that he placed the newspaper there. Inside the wastebasket were five empty beer cans. The evidence warranted the conclusion that all five beers were consumed by the defendant after he arrived home at 9:30 p.m. (having consumed two beers prior to his arrival home). See supra note 1.

An investigator asked the defendant if he purchased any beer on the way home on July 31st. The investigator testified at trial that the defendant denied it. At trial Ms. Gunderson and defendant both testified that defendant had bought beer on the way home on July 31st. Defendant explained that he had misunderstood the investigator's question about beer. He understood the officer to have asked him whether he bought beer at the grocery store when he picked up groceries. He testified that he answered in the negative because he bought beer at a different location.
[6] A police officer was interviewing defendant to get information for his report. Although the officer and defendant were in a private room, a commotion could be heard in the hallway when the ex-husband arrived and was told that the child was dead. The ex-husband was very upset and made a great deal of noise. Defendant turned white and said to the officer, "You are not going to let him get me or see me?" The officer assured defendant that they would have no contact. At the time defendant made this comment, no one had suggested any wrongdoing on his part, and the ex-husband had not seen the defendant, mentioned him, or made any threats toward him.

At the hospital, when Ms. Gunderson and defendant were eventually told that they could view the child's body, defendant initially made an excuse not to do so, although he ultimately did view the body. When Ms. Gunderson got up to go see the child's body, defendant indicated that they should not do so because a nurse was going to bring them some coffee. Ms. Gunderson went ahead without him. Defendant testified that he really meant that he needed to have the coffee to calm his stomach, and that a few moments later, he vomited.
[7] Ms. Gunderson testified that as she was carrying the victim up the stairs from the front yard, defendant "grabbed him away from me and was shaking him, saying, `Marshall, Marshall.'" She testified that she took the victim back and told the defendant not to handle the child that way.
[8] Defendant told the victim that if he did that again, the defendant would drop the child on his head. Ms. Gunderson told defendant not to say such a thing. Defendant testified that he only meant that if the victim persisted in squirming, that would cause the defendant to drop him. The State's theory was that on the night of July 31st, defendant had another encounter with the victim, became angry, and ultimately inflicted the fatal injury.
[9] To Ms. Gunderson's father and one of her friends, defendant suggested that the victim had gotten out of his crib; that the front door had been open; and that the victim had fallen and hit his head either on the concrete slab by the porch, or on a nearby coral rock. He suggested that the child had then crawled to the place where he had been found dead. These ideas were advanced prior to the autopsy and thus prior to the finding that the cause of death was severe skull fractures caused by blows from a blunt object. Later in the day, defendant said that he wanted to chop up the crib, the implication being that a malfunction in the crib had allowed the entire chain of events to occur.

Defendant testified that he was grief stricken and attempting simply to find an explanation for the child's death. He contended that there was nothing sinister or untoward about attempting to find an explanation for an otherwise inexplicable event.
Another witness testified that it had been rumored at the hospital, prior to the autopsy being conducted, that the child had had a severe skull injury.
[10] The six year old was awake until after the defendant came home at 9:30 p.m. The four year old had been put to bed at 8:30 p.m., at the same time as the victim.
[11] We must respectfully disagree with the position of the dissent. Defendant in this case has made no argument that his trial counsel was ineffective. Further, this case is governed by the general rule that the question of ineffective assistance of trial counsel cannot be raised for the first time on appeal from an adverse judgment, but must be presented instead to the trial court by motion for post-conviction relief. See Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla. 1987); State v. Barber, 301 So.2d 7, 9 (Fla. 1974). The record in this case is wholly inadequate to reveal what issues defendant's counsel may have considered in preparing the trial defense; whether there is reason to believe that the medical examiner overlooked the stomach contents (which he described in his report) in estimating the time of death; and whether cross-examination on this issue would have yielded any information of benefit to the defendant rather than the State. See generally Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We therefore decline to reach any issue regarding the effectiveness of trial counsel, and intimate no view on the subject. This court's ruling is without prejudice to defendant's right to raise the issue by motion for post-conviction relief.
[1] E.F. Rose, Factors Influencing Gastric Emptying, 24 Journal of Forensic Sciences 200, 206 (1979); B. Madea, M. Oehmichen, C. Henssge, Postmortem Transport of Gastric Contents? [German] Zeitschrift fur Rechtsmedizin, 97(3) Journal of Legal Medicine, 201, 206; G.K. Murphy, The Trials of Steven Truscott, 12(4) American Journal of Forensic Medicine & Pathology 344, 349 (1991); T. Suzutani, H. Ishibashi, T. Takatori, Studies on the Estimation of the Postmortem Interval, 8 Burned Bodies (author's transl). [Japanese] Hokkaido Igaku Zasshi, 53(6) Hokkaido Journal of Medical Science 460, 464 (1978).