947 So.2d 495 (2006)
Kris Edward HELTON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D04-1133.
District Court of Appeal of Florida, Third District.
November 22, 2006.
Rehearing Denied February 13, 2007.
*496 Mel Black, for appellant.
Charles J. Crist, Attorney General, and Erin Kinney and Jennifer Moore, Assistant Attorneys General for appellee.
Before COPE, C.J., and GERSTEN, and WELLS, JJ.
WELLS, Judge.
Kris Edward Helton appeals from denial of his rule 3.853 motion for postconviction DNA testing. We affirm.
Helton was convicted in 1992 for the murder of twenty-two month old Marshall Gunderson. At the time of Marshall's death, Helton was living with Marshall's mother, Marcella Gunderson and her three sons, Michael, age four, Matthew, age six, and Marshall.
On the evening of Marshall's death, Helton arrived home around 9:30 p.m. Marshall, who had an ear infection, had already been fed a light dinner, and, along with his four year old brother, had been put to bed. Helton had already consumed two beers before arriving home. He drank five more before going to bed.
Sometime around 11:00 p.m., Gunderson checked on her children, then she and Helton went to bed. Gunderson dozed off around 11:15 p.m., but awakened around 1:30 a.m. to find Helton awake in bed and smoking a cigarette. She noticed that he had a worried look on his face. After *497 speaking briefly to Helton, Gunderson went to check on the children and discovered that Marshall was not in his crib.
She and Helton then searched the interior of the house, and found a large pitcher, its contents of Kool-Aid spilled, lying on the kitchen floor. When she noticed that the front door was open, Gunderson stepped outside and found Marshall lying face down at the bottom of the front steps on a concrete slab adjacent to a graveled area. According to a statement given to the police by Helton, Gunderson scooped Marshall up, brushed some gravel off him, and took him into the house where she and Helton performed CPR on him until fire rescue arrived. Despite these efforts, Marshall was pronounced dead on arrival at a local hospital.[1]
An autopsy performed on Marshall determined that he died from skull fractures caused by blows from a blunt instrument. The fractures were so severe that Marshall's brain had protruded between breaks in his skull.
Helton ultimately was charged with the first degree murder of Marshall Gunderson. At trial, he asserted a number of defenses, claiming alternatively that the child died from an accidental fall from the porch steps or that the child was killed by an intruder or Gunderson. Medical evidence ruled out accidental death, and there was no evidence of forced entry into the fenced and gated yard or the home. Based on circumstantial evidence, Helton was convicted. That conviction, although initially reversed,[2] was affirmed in Helton v. State, 641 So.2d 146 (Fla. 3d DCA 1994). Helton's 92-page post conviction 3.850 motion alleging ineffective counsel, and his 43-page motion for rehearing of the order denying that motion, were denied. The order denying his 3.850 motion was affirmed by this court.
Helton now claims that he is innocent, that Gunderson killed her child, and that DNA testing of a number of items found on the child's body,[3] inside the home,[4] and outside the home near where the child was found[5] will exonerate him.
Rule 3.853 authorizes DNA testing only where a movant states "how the DNA testing requested by the motion will *498 exonerate the movant of the crime." Fla. R.Crim. P. 3.853(b)(3) (emphasis added). Thus, "[u]nder rule 3.853, a motion for postconviction DNA testing must include, among other things, `a statement that the movant is innocent and how the DNA testing requested by the motion will exonerate the movant of the crime for which the movant was sentenced.'" Hitchcock v. State, 866 So.2d 23, 27 (Fla.2004) (quoting Fla. R.Crim. P. 3.853(b)(3)). "[I]n pleading the requirements of rule 3.853, [the movant] must lay out with specificity how the DNA testing of each item requested to be tested would give rise to a reasonable probability of acquittal or a lesser sentence. In order for the trial court to make the required findings, the movant must demonstrate the nexus between the potential results of DNA testing on each piece of evidence and the issues in the case." Id. (emphasis added).
"On the issue of whether the requested DNA testing will exonerate the defendant, the determination of whether the defendant's allegations are facially sufficient requires consideration of the facts of the crime itself and the other available evidence. Cases addressing this issue have uniformly held that DNA testing will not be permitted if the requested DNA testing would shed no light on the defendant's guilt or innocence." Zollman v. State, 820 So.2d 1059, 1062-63 (Fla. 2d DCA 2002).
Here, as the trial court found, DNA testing of the items identified by Helton in the hopes of finding Gunderson's DNA could in no way shed light on Helton's guilt or innocence. Gunderson lived with Marshall and Helton in the home where all of these items were found. Thus, Gunderson's DNA on any or all of these items, in the home or in the yard, is to be expected. See Hitchcock, 866 So.2d at 25-28.
Helton's allegations that two of these items, the pieces of pea gravel and a rock wrapped in a paper towel, may have blood on them, does not change this result. People garden outside their homes, people walk barefoot outside their homes, people cut themselves and occasionally bleed outside their homes. Helton cannot satisfy his burden regarding these two items simply by claiming that they were found near where the child was discovered; that they may have blood on them; and that neither he nor the child bled at the time of the child's death. The identification of Gunderson's DNA on these items would do no more than show that at some time Gunderson had bled outside the home.
Especially unpersuasive is Helton's claim with regard to the nine pieces of pea gravel which he alleges were "found where the victim was discovered." An attachment to Helton's motion regarding this evidence shows that the gravel was not found where this child was discovered, but was actually "found" in the child's throat by the medical examiner during autopsy. Helton told the police in a statement that is part of the record that he saw Gunderson wipe dirt and pea rock from Marshall's face after she picked him up to take him into the house and that both he and Gunderson administered CPR to the child. Given these facts, it would not be at all surprising to find Gunderson's DNA on the pea gravel and it would certainly in no way "give rise to a reasonable probability of acquittal."
Nor did Helton sustain his burden as to the rock wrapped in the paper towel. Helton has repeatedly conceded that there is no evidence that Gunderson had any scrapes or cuts on her hands or body at the time of Marshall's death. And nowhere in his motion does he allege that evidence exists that Gunderson's blood or DNA could only have gotten on this rock *499 and paper towel at the time of Marshall's death as opposed to any time before or after the child was discovered. By Helton's own account, Gunderson's hands came into contact with some pea rock or gravel when she picked the child up. That in and of itself could cause abrasions on the hands. Given these circumstance, Helton simply could not and did not demonstrate how this piece of evidence would exonerate him. Thus, as to both the pea gravel and the rock in the paper towel, we believe that the trial court got it exactly right when it concluded:
As to item 1, the white paper towel with the small, bloodstained rock. Nothing in the record makes these items relevant to the crime. Even if DNA was found on the rock and it was not that of the Defendant or of Ms. Gunderson  or even if it were Ms. Gunderson's  there would be no way to demonstrate that the DNA belonged to a wounded murderer or that it was deposited at the time of the crime. The results of DNA testing would not exonerate the Defendant.
As to item 2, nine pieces of pea rock gravel. Nothing in the record makes these items relevant to the crime. Even if the Defendant's suspicion that there may be blood on the gravel is borne out and the DNA was not that of the Defendant or of Ms. Gunderson  or even if it was Ms. Gunderson's  there would be no way to demonstrate that the DNA belonged to a wounded murderer or that it was deposited at the time of the crime. The results of DNA testing would not exonerate the defendant.
Because the record in this case conclusively shows that Helton is entitled to no relief, the order under review is affirmed. See Fla. R.App. P. 9.141; Zollman, 820 So.2d at 1063 (observing that "after considering the State's response, the trial court may either enter an order on the merits of the motion or set the motion for hearing. See Fla. R.Crim. P. 3.853(c)(3)").
NOTES
[1] The facts surrounding this tragedy are more fully explicated in Helton v. State, 641 So.2d 146 (Fla. 3d DCA 1994).
[2] See Helton v. State, 18 Fla. L. Weekly D1215 (Fla. 3d DCA May 11, 1993).
[3] These items consist of a hair found on the child's body, the pajamas that he was wearing at the time of his death, and fingernail scrapings.
[4] These items consist of: (1) the main entrance door to the house; (2) the crib, mattress, and sheet from the child's bed; (3) Helton's white lace up shoes thought by detectives to have been used to stomp on Marshall's head; (4) a pair of pants, shirt, and socks which Helton supposedly wore when he allegedly removed Marshall from his crib and killed him; (5) a blue towel thought to have been used to wipe off blood, sweat, and/or saliva after the murder; (6) an orange plastic pitcher that had contained the Kool-Aid found spilled on the kitchen floor; (7) a trash can with five empty Budweiser beer cans and various cigarette butts found in the master bedroom where Helton and Gunderson slept; (8) a bolt from the victim's crib which was suspected of being cut with a pair of blue-handled cutters; and (9) a spring and length of black plastic coated wire used to hold up the fallen side of Marshall's crib.
[5] These items consist of: (1) a white paper towel with a small allegedly blood stained white rock; (2) nine pieces of allegedly blood stained pea gravel; (3) a large white coral rock which the prosecutor argued might have been used to inflict the fatal blows; (4) various bags of rocks found where the victim was discovered; and (5) a cinderblock brick thought by the detectives to have been used to inflict the fatal blows.